**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| T. MARZETTI COMPANY, | : | |
| | : | |
| **Plaintiff,** | : | Case No. 2:09-CV-584 |
| | : | |
| v. | : | **JUDGE ALGENON L. MARBLEY** |
| | : | **MAGISTRATE JUDGE KING** |
| ROSKAM BAKING COMPANY, | : | |
| | : | |
| **Defendant.** | : | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on Defendant, Roskam Baking Company's ("Roskam")

Motion for Summary Judgment, (Doc. 26) and on Plaintiff, T. Marzetti Company's ("Marzetti")

Motion for Partial Summary Judgment. (Doc. 37.).[1]  For the reasons set forth below Roskam's

Motion for Summary Judgment is **DENIED** and Marzetti's Motion for Partial Summary

Judgment is **DENIED**.

### II. BACKGROUND INFORMATION

### A. FACTUAL BACKGROUND

#### 1. The Parties

Plaintiff Marzetti is an Ohio corporation with its principal place of business in Columbus,

Ohio.  Defendant Roskam is a Michigan corporation with its principal place of business in Grand

Rapids, Michigan.  Marzetti and Roskam are in the business of selling a variety of food products

in the United States.  Among these products are croutons.  Both Marzetti and Roskam have been

---

[1]Also before the Court is Roskam's Motion for Leave to File Supplemental Brief, which
is hereby **GRANTED**.

using the words "Texas Toast" in connection with their crouton products.  It is the use of the term "Texas Toast" which is at issue in the current litigation.

Beginning in February of 2007, Marzetti launched a new brand of croutons under Marzetti's "New York Brand" trademark.  Marzetti began using the words "The Original Texas Toast" and "Texas Toast" in connection with its New York Brand.  Marzetti had already been using the New York Brand trademark and the "Texas Toast" name for its line of frozen, thickly sliced bread.  To Marzetti's knowledge, however, no manufacturer had yet used the words "Texas Toast" in connection with packaged croutons.  Marzetti alleges that its Texas Toast croutons are well-known in the United States and that they have acquired a distinctive reputation among the public.  In launching its new brand of croutons, Marzetti allegedly targeted the market shares of competitors.

On February 18, 2009, Marzetti filed a trademark application with the United States Patent and Trademark Office (" US PTO") to obtain a trademark registration for the mark "Texas Toast" for "croutons and tortilla strips." (Pl. Compl. Doc. 2 Ex. A.)  Also on February 18, 2009, Marzetti filed a trademark application with the US PTO to obtain a trademark registration for the mark "The Original Texas Toast" for "croutons and tortilla strips." (Pl. Compl. Doc. 2 Ex. B.)

Beginning in 2009, Roskam launched a new brand of croutons under the Rothbury Farms label.  These croutons also used the words "Texas Toast." Marzetti states that it became aware of Roskam's use of the "Texas Toast" mark on or about June 11, 2009.  On June 16, 2009, Marzetti sent a letter to Roskam, requesting that Roskam "cease and desist in acts of trademark infringement and unfair competition." (Pl. Compl. Doc. 2 p. 4.)  On June 30, 2009, Roskam

responded to Marzetti's letter; and correspondence between the parties continued for a period of time.

## 2. The Crouton Industry

Packaged croutons, like those of Marzetti and Roskam, are generally sold in the produce or grocery sections of a store. Produce croutons have historically had higher prices and quality. Grocery croutons are lower in price and less likely to be sold in resealable packages. Retailers generally do not feature produce brands of croutons in the grocery section of a store; nor will they carry grocery brands of croutons in the produce section.

Roskam asserts that there is an industry custom to which crouton product packaging conforms. That custom is to style the crouton package according to the following layout:

House Mark
Type
Product.

As examples of this industry custom, Roskam points to the crouton product packaging of Pepperidge Farm, Meijer, Marie Callendars, Mrs. Cubison's, Arnold, Brownberry, and Fresh Gourmet. (*See* Def. Reply to Mot. for Summ. Judg. Doc. 21 pp. 8-9.) Among the brands conforming to the industry custom, Roskam argues that the type of crouton is as prominent or more prominent than the house mark or brand. Marzetti, however, asserts that there is no such industry custom and references certain crouton brands, including Kroger, Old Lundon, Cardini's, and Special Edition that do not conform to the alleged industry custom. (*See* Pl. Resp. to Mot. for Summ. Judg. Doc. 33 pp. 22-26.)

### 3. Marzetti's Use of the Words "Texas Toast"

Marzetti developed five flavors in its New York Brand, Texas Toast croutons. These include: (1) Caesar; (2) Cheese & Garlic; (3) Garlic & Butter; (4) Sea Salt & Pepper; and (5) Seasoned. According to Marzetti, Sea Salt & Pepper was a new flavor in the packaged crouton industry. Marzetti chose new recipes for three of the remaining four flavors. All five flavors were packaged in resealable foil bags, a packaging that was at that time most prevalent among produce croutons. The new packages featured croutons that were the same size as those found in the Marzetti or Cardini brand crouton packages, other brands which Marzetti had previously used to market its crouton products. The New York Brand croutons, however, had a higher percentage of larger-sized croutons than the other two brands.

Marzetti's New York Brand Texas Toast crouton packaging features a yellow resealable bag with several words featured on the front of the package. Located, just below the words "Resealable, Stays Fresh, Easy to Open," is "New York" followed the word "Brand" in a smaller font with the trademark symbol, ™. Found next, below on the package, are the words "The Original," with "Texas Toast," appearing in all capital letters and in a font larger than anything else found on the package. Underneath the word "Croutons," also in all capital letters, appears followed directly by additional words, for example, "Sea Salt & Pepper." Lower down on the package are the words: "Big Bites, Bold Flavor," in all capital letters. On the back of the package again are the words "Big Bites, Bold Flavor," under which Marzetti states the following:

> We think croutons should be big and bold – big in size and bold in flavor. That's why we've developed New York Brand Texas Toast Croutons with the Texas Toast cut. They're made with the same commitment to great taste that's made New York Brand Texas Toast America's top-selling frozen garlic bread.

We start with home-baked French bread, generously seasoned for optimal taste satisfaction, and then we cut the loaves into big Texas-size bites. Bigger bites and bloder flavor – that's what makes New York Brand Texas Toast Croutons so delicious!

From the launch of the New York Brand Texas Toast Croutons in February of 2007, until the Spring of 2009, Marzetti was not using the trademark symbol, ™, on its packages next to the words "Texas Toast." Marzetti did place the trademark symbol, ™, near the words "Texas Toast" near the recipe section on the back panel of the crouton packaging.

## 4. Roskam's Use of the Words "Texas Toast"

Roskam was aware of Marzetti's New York Brand of Texas Toast croutons prior to the launch of Roskam's own version of Texas Toast croutons. Roskam was also aware that Marzetti's product had been successful in the marketplace, and Roskam believed there was a consumer demand for Texas Toast cut croutons. Roskam uses "Texas Toast" to convey to the consumer that its croutons are allegedly made with bigger cuts. Roskam argues that is uses the words "Texas Toast" in the Type section of its crouton packages, and that this use conforms with industry custom. Roskam further asserts that it uses "Texas Toast" in the same manner and function as it uses the words "Fat Free," "Organic," "Cheese Garlic," "Buttery Garlic," and "Seasoned." Roskam argues that because there has never been any question that these other terms are not trademarks, and because Roskam uses the words "Texas Toast" in the same manner, then "Texas Toast" is also not a trademark.

Roskam's Rothbury Farms Texas Toast crouton packaging features a blue resealable bag which fades to black at the top of the package. Located just below the words "Resealable for Freshness, Tear to Open. Zip to Close," are the words "Rothbury Farms." "Rothbury Farms" is written in all capital letters and is featured in gold. The word "Farms" appears to be slightly

smaller than it's counterpart "Rothbury." On the package, "Rothbury Farms" represents what Roskam would classify as the House Mark. Underneath the House Mark are the words "Texas Toast," which are written in a script-style type font and are depicted in white. Underneath "Texas Toast" are the words "Cheese Garlic" (though the words differ according to the flavoring of crouton), which are also in white, though slightly smaller and in a print font. The words "Texas Toast Cheese Garlic" represent what Roskam classifies as the Type, according to industry custom. Underneath the Type is the word "Croutons," which is also in white and smaller than "Cheese Garlic." The word "Croutons" represents what Roskam classifies as the Product.

## B. PROCEDURAL BACKGROUND

On July 8, 2009, Marzetti initiated the current action seeking damages, injunctive relief, and other relief deemed appropriate and just. In its Complaint, Marzetti alleges five causes of action: (1) violation of section 43(A) of the Lanham Act; (2) violation of the Ohio Uniform Deceptive Trade Practices Act; (3) a common law trademark infringement claim (4) a common law unfair competition claim; and (5) a common law dilution claim. (See Pl. Compl. Doc 2 pp. 5-7.)

On October 30, 2009, Roskam filed its Amended Answer to Marzetti's Complaint with Roskam's Counterclaims. In its Counterclaim, Roskam seeks: (1) a declaratory judgment of non-violation of section 43(A) of the Lanham Act; (2) a declaratory judgment of non-violation of the Ohio Uniform Deceptive Trade Practices Act; (3) a declaratory judgment of non-infringement of common law trademark; (4) a declaratory judgment of non-violation under common law unfair competition; (5) a declaratory judgment of non-dilution under the common

law; and (6) an order finding Marzetti in violation of common law unfair competition with an award for damages and other relief. (See Def. Am. Answer and Counterclaim Doc. 24 pp. 8-13.)

On September 15, 2009, Marzetti filed a Motion for a Preliminary Injunction. Marzetti and Roskam consulted and later advised this Court of the parties' desire to consolidate the hearing on the Motion for Preliminary Injunction with a bench trial in this case. In two Orders dated September 25, 2009, this Court: (1) held the Motion for a Preliminary Injunction in Abeyance pending trial to allow Roskam to respond; and (2) set a trial date and other deadlines, and referred the case to mediation.

On November 23, 2009, Roskam filed a Motion for Summary Judgment. On January 19, 2010, Marzetti filed a Partial Motion for Summary Judgment. Both Motions for Summary Judgment have been fully briefed, orally argued, and are now ripe for decision.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ.

P.56(e)(2); *see Celotex*, 477 U.S. at 324; *Search v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV. LAW AND ANALYSIS

Roskam argues that it is entitled to summary judgment on three bases: (1) that Roskam's use of the words "Texas Toast" is non-trademark use; (2) that Roskam's use of the words "Texas Toast" constitutes fair use; and (3) that Marzetti has unclean hands.

Marzetti argues that it is entitled to summary judgment for five reasons: (1) that "Texas Toast" is a protectable, enforceable trademark because the words are suggestive, and not descriptive, as to packaged croutons; (2) that Roskam's use of the words "Texas Toast" on Roskam's crouton packages creates a likelihood of confusion; (3) that Roskam's use of the words "Texas Toast" do not constitute fair use; (4) that Marzetti does not have unclean hands; and (5) that Marzetti is entitled to a permanent injunction.

As a preliminary matter, this Court notes that all of the claims asserted by Marzetti and the counterclaims asserted by Roskam are subject to analysis under federal trademark and unfair competition statutes. *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) ("Under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, we use the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin: the likelihood of confusion between the two marks.") *Victoria's Secret Stores v. Artco Equipment Co.*, Inc., 194 F. Supp. 2d 704, 724 n. 8 (S.D. Ohio 2002) (finding analysis under federal law "applies to

trademark infringement, unfair competition, Ohio common law, and Ohio's deceptive trade practices statutes").[2]

Section 43(A) of the Lanham Act provides a federal cause of action for infringement for marks and trade dress that have not obtained federal registration. 15 U.S.C. § 1125(a); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760-61 (6th Cir. 2005). To evaluate a claim under the Lanham Act, "courts must determine whether the mark is protectable, and if so, whether there is a likelihood of confusion as a result of the would-be infringer's use of the mark." *Id*. at 761.

## A. EXISTENCE OF A PROTECTABLE MARK

Whether a mark qualifies for trademark protection is determined by where it "falls along the established spectrum of distinctiveness." *DeGidio v. West Group Corp.*, 191 F.3d 506, 510 (6th Cir. 2004) (internal citations omitted). Marks may be "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (2002) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (C.A.N.Y. 1976)).

Generic marks are the weakest and can never be trademarks. *Champions Golf Club, Inc. v. The Champions Golf Club*, 78 F. 3d 1111, 1116-17 (6th Cir. 1996). "A generic term is one that is commonly used as the name of a kind of goods. Unlike a trademark, which identifies the source of a product, a generic term merely identifies the genus of which a particular product is a species." *Tumblebus, Inc.*, 399 F.3d at 762 n. 10. If a mark is primarily associated with a type of product rather than with the producer, it is generic. *Natron Crop v. STMicroelectronics, Inc.*, 305 F.3d 397, 404 (6th Cir. 2002). "Whether a name is generic is a question of fact." *Bath &*

---

[2]In their briefs, both Marzetti and Roskam acknowledge that this Court need not separately address the state law statutory and common law claims.

*Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 748 (C.A.6 (Ohio),1996)

(citing 2 McCarthy on Trademarks and Unfair Competition § 12.02(7)(b)). Where the

mark at issue is not registered and the defendant argues that the alleged trademark is generic,

then the plaintiff has the burden to prove the mark is not generic. *Id*.

Descriptive marks "specifically describe[] a characteristic or ingredient of an article," and

"can, by acquiring a secondary meaning...become a valid trademark." *Induct-O-Matic Corp. V.*

*Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984). A mark is descriptive "if it describes

one, or more, of the following: 'the intended purpose, function or use of the goods...the class of

users of the goods; a desirable characteristic of the goods; or the end effect on the user."

*Degidio*, 355 F.3d at 510 (quoting *Wynn Oil Co. V. Thomas*, 839 F.2d 1183, 1190 (6th Cir.

1988)). There is a six factor test to determine whether the alleged trademark is descriptive:

> (1) How much imagination on the buyer's part is required in trying to cull a direct
> message from the mark about the quality, ingredients or characteristics of the
> product or service? In doing this, it must be kept in mind that the ordinary
> consumer does not spend much time in the marketplace lingering over such
> problems. On the other hand, if the potential buying class at issue are experts or
> professionals, a more critical examination is reasonable.
> (2) Does the mark directly convey a real and unequivocal idea of some
> characteristic, function, quality or ingredient of the product or service to a
> reasonably informed potential buyer? That typical buyer will already have some
> knowledge about the product or service and is neither an expert nor a totally
> uninformed about the product. Is some reflection or multi-stage reasoning process
> necessary to cull some direct information about the product from the term used as
> a mark?
> (3) Does the mark so closely tell something about the product or service that other
> sellers of like products would be likely to want to use the term in connection with
> their goods? Perhaps a more realistic way to pose this question is to ask whether,
> without any prior knowledge of this mark, others would be likely to want to use it
> to describe their products?
> (4) Are, in fact, other sellers now using this term to describe their products? Even
> if the mark is descriptive and has attained secondary meaning, if many others in
> other product markets are using this term, the mark may be labelled [sic] "weak"
> and entitled only to narrow protection.

(5) Even though the mark may tell something about the goods or services, is it just as likely to conjure up some other, purely arbitrary connotation? E.g., SUGAR & SPICE baked goods, or POLY PITCHER plastic pitchers.
(6) How does the mark fit into the basic concept that descriptive marks cannot pinpoint one source by identifying and distinguishing only one seller? That is, are buyers likely to regard the mark really as a symbol of origin, or merely as another form of self-laudatory advertising?

*DeGidio*, 355 F.3d at 510-11 (quoting 2 McCarthy § 11.71).

A suggestive mark "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods. Such a term can be protected without proof of a secondary meaning." *Id*. at 362-63. The strongest marks are fanciful or arbitrary. *Little Caesar Enters., Inc., v. Pizza Cesear, Inc.*, 834 F. 2d 568, 571 (6th Cir. 1987). "A 'fanciful' mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned . . . . An 'arbitrary' mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached." *Id*.

Roskam argues that the words "Texas Toast" are generic, or descriptive without a secondary meaning, and are not entitled to trademark protection. Marzetti argues that the words "Texas Toast" are suggestive. In this case, the meaning of the words "Texas Toast" is a factual question. Whether the meaning of that term constitutes a generic, descriptive, or suggestive mark is also a "factual determination of the mark's distinctiveness." *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985) (Frish's II).

Roskam alleges that "Texas Toast" is generic to bread products, including croutons. It points to the term conveying something about the size of the product with which it is associated. According to Roskam, "Texas Toast" means something about the size of the product because it

is commonly understood in our lexicon that "everything is bigger in Texas." Marzetti argues that "Texas Toast" does not convey the same message with regard to croutons as it otherwise conveys with regard to French bread. According to Marzetti, use of the words "Texas Toast" as to croutons does not have a single meaning and requires the customer to use his or her imagination when viewing the product. Marzetti asserts that Roskam is incorrect to try to stretch any message conveyed by Texas Toast French bread products to include all bread products. As further evidence that "Texas Toast" is not generic or descriptive as to croutons, Marzetti points to the variety of responses given by Roskam's own deposition witnesses as to what "Texas Toast" means. The parties disagree about the meaning consumers attribute to the words "Texas Toast." Marzetti believes that when customers see "Texas Toast" on the Marzetti crouton packages they are recognizing a brand of croutons. Roskam argues that consumers draw meanings about the size of the croutons from the words "Texas Toast." A genuine issue of material fact exists as to the meaning of the words "Texas Toast" in this case, making summary judgment inappropriate.

## B. NON-TRADEMARK USE

The Sixth Circuit has stated that "the likelihood of confusion analysis also involves a preliminary question: "whether the defendants 'are using the challenged mark in a way that identifies the source of their goods.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009) (quoting *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 694 (6th Cir. 2003)). Non-Trademark use, or use of the mark in a way that does not identify the source of the product, is not subject to the trademark laws. *Interactive Prods. Corp.*, 326 F.3d at 695; *Cf. New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 307 (9th

Cir.1992) (holding that infringement laws "simply do not apply" to a "non-trademark use of a mark").

Roskam argues that it uses its trademark, "Rothbury Farms," to identify the source of its croutons and that the federally registered logo of Rothbury Farms appears prominently in gold on all Roskam products. According to Roskam, Rothbury Farms is the trademark for Roskam's croutons, not Texas Toast, and where the words Texas Toast appear on crouton packages the term is being used in a non-trademark way. Roskam further argues that the words "Texas Toast" appear in the same manner and in the same place as "Fat Free," "Italian Style" and "Seasoned," to identify the type of crouton contained within the Rothbury Farms package. Roskam states that its style of packaging which follows the layout of House Mark (Rothbury Farms), which is found on top of Type (Texas Toast, Fat Free, Italian Style, Seasoned, etc.), which is found on top of Product (Crouton). Roskam asserts that this layout conforms to industry custom and points to the packaging of croutons for Meijer, Pepperidge Farm, Fresh Gourmet, Brownberry, and others to support this proposition.

Marzetti argues that Roskam is using the words "Texas Toast" as an attention-getting symbol. Marzetti asserts that the words appear prominently as the largest element on Roskam's packaging, while the House Mark is muted or recessive in comparison.[3] As above, since there is an underlying factual dispute about the meaning of "Texas Toast" as to croutons, and whether the words are entitled to trademark protection, it can not be determined at this stage of the

---

[3]The words "Texas Toast" were originally drafted in a black font, then changed to gold and finally white to allow them to stand out on the package. (Letinen Dep., pp. 164:10-165:3, 175:14-17.)

litigation whether Roskam is using the term as a trademark or not. Therefore, Roskam is not entitled to summary judgment based on a non-trademark use of the term "Texas Toast."

## C. LIKELIHOOD OF CONFUSION

The "touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir.1997). This same standard is used to determine liability under section 1125 as well. *Champions Golf Club, Inc.*, 78 F. 3d at 1123. The Sixth Circuit has adopted an eight-factor test for determining likelihood of confusion: "'(1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; [and] (8) likelihood of expansion of the product lines.'" *Frish's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F. 2d 642, 648 (6th Cir. 1982) (*Frisch's I*) (quoting *Toho Co., Ltd. v. Sears, Roebuck & Co.*, 645 F. 2d 788 (9th Cir. 1981)).[4]

Determining whether there is a likelihood of confusion requires the court to examine the facts of a particular case. *Champions Golf Club, Inc.*, 78 F. 3d at 1116 (6th Cir. 1996). In conducting this analysis a court should remember that:

---

[4]"[T]he determination of what is the state of affairs regarding each factor ... [considered by the lower court in determining whether there is a likelihood of confusion] is a finding of fact reviewed on the clearly erroneous standard, but the further determination of the likelihood of confusion based on those factors is a legal conclusion." *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 651 (6th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982) (quoting *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 443-44 (9th Cir.1980)).

These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. But a thorough and analytical treatment must nevertheless be attempted. The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

*Homeowners Group, Inc.*, 931 F.2d at 1107 (6th Cir. 1991). "[A] plaintiff need not show that all, or even most, of the factors are present in any particular case to be successful." *Wynn Oil*, 839 F.2d at 1186. A genuine dispute of material fact on any one of the eight factors does not make summary judgment improper in a particular case. *Autozone, Inc. v. Tandy Corp.*, 373 F.3d 786 (6th Cir. 2004). A grant of summary judgment is improper where there are genuine factual disputes as to "factors which may be material in the context of the specific case." *Homeowners Group, Inc.*, 931 F.2d at 1107 (6th Cir. 1991).

### 1. Strength of the Plaintiff's Mark

"The more distinctive a mark, the more likely is the confusion resulting from its infringment, and therefore, the more protection is due." *Frisch's II*, 759 F.2d at 1264. As discussed above, a genuine issue of material fact exists as to the meaning of the words "Texas Toast" in this case, and about whether the "Texas Toast" mark is generic, descriptive, or suggestive. Therefore, the Court is unable to determine the strength of Marzetti's mark at issue. In this case, the strength of the mark is a factor which is material. This Court's inability to consider this factor in its analysis essentially means that the Court is unable to determine that there is a likelihood of confusion between Marzetti and Roskam at this stage in the litigation.

## 2. Relatedness of the Goods

The Sixth Circuit has put forth "three benchmarks regarding the relatedness of parties'

goods and services." *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003).

> First, if the parties compete directly by offering their goods or services, confusion
> is likely if the marks are sufficiently similar; second, if the goods or services are
> somewhat related but not competitive, the likelihood of confusion will turn on
> other factors; third, if the goods or services are totally unrelated, confusion is
> unlikely.

*Daddy's Junky Music Stores*, 109 F.3d at 282. Services and goods "are 'related' not because

they coexist in the same broad industry, but are 'related' if the services are marketed and

consumed such that buyers are likely to believe that the services, similarly marked, come from

the same source, or are somehow connected with or sponsored by a common company."

*Homeowners Group*, 931 F.2d at 1109.

Here, both Marzetti and Roskam market Texas Toast croutons in the same grocery stores.

The parties' products are related, as Marzetti and Roskam compete directly in the crouton

industry. The Court finds this factor weighs in favor of a finding a likelihood of confusion.

## 3. Similarity of the Marks

The "[s]imilarity of the marks is a factor of considerable weight." *Daddy's Junky Music*

*Stores*, 109 F.3d at 283. In evaluating this factor courts should consider "pronunciation,

appearance, and verbal translation of conflicting marks." *Champions Golf Club*, 78 F.3d at 1118

(internal quotation marks and citations omitted). Examining the marks side-by-side in the

courtroom "does not accurately portray market conditions." *Daddy's Junky Music Stores*, 109

F.3d at 283. And alleged marks must be reviewed in terms of what actually occurs in the

marketplace. *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1440 (S.D. Ohio

1990) Courts should also consider whether a mark, when viewed alone, would confuse the public. *Id.* ("sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague or even hazy, impression or recollection of the other party's mark.").

The marks in this case involve exactly the same words: "Texas Toast" which are pronounced the same way for both Marzetti and Roskam's crouton packaging. The marks appear in similar places on the packaging, both are featured underneath a brand name: The New York Brand or Rothbury Farms. There is disagreement between the parties as to the similarity of the appearance of the words "Texas Toast." Therefore, this Court can not make a determination at this time as to how this element factors into the likelihood of confusion analysis in this case.

### 4. Evidence of Actual Confusion

Though "[e]vidence of actual confusion is undoubtedly the best evidence of likelihood of confusion...it does not follow that lack of evidence of actual confusion should be a significant factor." *Wynn Oil*, 839 F.2d 1183, 1188 (6th Cir. 1988); *see also Daddy's Junky Music Stores*, 109 F. 3d at 284 ("[D]ue to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant.").

Marzetti argues that email correspondence from a Roskam customer is an instance of actual confusion. (Pl. Mot. for Summ. Judg. Doc. 36 p. 21.)[5] Roskam argues that the email is

---

[5]The email reads, in pertinent part:
My family and I just wanted to comment on these croutons. We actually purchased this brand by accident, we usually buy another Texas Toast brand. Although we were more than willing to try your brand, we found them to be unsatisfying. They are terribly hard, for one thing. Also they are cut in such big pieces that one must cut them to be able to eat them with salad (not an easy thing considering how tough they are). When cutting them they break into tons of

hearsay, vague as to the circumstances surrounding the purchase of the croutons, and does not show that the customer involved purchased Roskam's croutons thinking they were those of Marzetti. Roskam points to the deposition testimony of Marzetti's Rule 30(b)(6) witness that there have been approximately eight months of competing sales between Marzetti and Roskam without any evidence of actual confusion. (Def. Resp. to Pl. Mot. for Summ Judg. Doc. 21 p. 22). Further, Roskam argues that Marzetti's failure to hand over, as part of the discovery process, the results of a study commissioned by Marzetti show that there is no actual evidence of confusion in the marketplace. There are genuine issues of material fact in dispute about whether there is actual evidence of confusion. Therefore, this Court can not make a determination at this time as to how this element factors into the likelihood of confusion analysis in this case.

### 5. Marketing Channels Used

The marketing channels used "factor requires a court to consider the similarities or differences between the predominant customers of the parties' respective goods or services. Further, a court must determine whether the marketing approaches employed by each party resemble each other." *Daddy's Junky Music Stores*, 109 F.3d at 285 (internal citation omitted). Both Marzetti and Roskam agree that they market their croutons to the same customers in the same grocery stores, such that the marketing channels used are the same. As a result, the Court finds this factor supports a finding of likelihood of confusion.

---

pieces.
I'm sure you want to make the best product for your customers, so I thought you
would find our opinion helpful. I hope you will take it into consideration.
(Pl. Mot. for Summ Judg. Doc 36 Ex. A pp. 1-2.)

### 6. Likely Degree of Purchaser Care

While this factor is part of the analysis, "[t]he ultimate significance of a given degree of care...will often depend upon its relationship with the other seven factors." *Daddy's Junky Music Stores*, 109 F.3d at 285. In assessing the likely degree of purchaser care, the court uses the standard of a typical buyer exercising ordinary caution. *Homeowners Group*, 931 F.2d at 1111; *Little Caesar Enters., Inc.*, 834 F.2d at 571 ("The normal consumer is the 'reasonably prudent buyer.'"). Where products are relatively inexpensive, purchasers will be less careful in their buying decisions. *Worthington Foods, Inc.*, 732 F. Supp. at 1448.

Roskam argues that "the degree of consumer cautiousness is not material – no one has been confused ."(Def. Resp. to Pl. Mot. for Summ Judg. Doc. 21 pp. 22-23.) Marzetti asserts that because croutons are relatively inexpensive and that customers "do not spend significant time on crouton purchasing decisions." (Pl. Mot. for Summ. Judg. Doc. 36 p. 22.) The Court agrees with Marzetti that the products of Marzetti and Roskam are relatively inexpensive and that crouton purchasers do not spend any significant amount of time making their purchasing decisions. Therefore, the Court finds that this factor weighs in favor of finding a likelihood of confusion.

### 7. Intent in Selecting the Mark

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners Group*, 931 F.2d at 1111. A plaintiff need not provide direct evidence that a defendant intentionally copied a mark; establishing instead that the defendant used the mark with knowledge of the mark's protection can be sufficient to support a finding of intentional copying. *Id*. In addition, knowledge can be

presumed upon proof of "extensive advertising and long-term use of a protected mark." *Id.  See also*, *Champions Golf Club*, 78 F.3d at 1121 ("[U]se of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement.").

Marzetti argues that Roskam did not merely intend to compete with Marzetti, but that Roskam wanted to use the words "Texas Toast" to get consumers to try its croutons because Marzetti was already using these words.  Marzetti essentially states that Roskam was trying to coopt Marzetti's success for Roskam's own gain.  Marzetti assets that Roskam did not try to develop a name for its new crouton, nor did it use any of the terms previously used to describe "big" croutons over the years.

Roskam argues that it did not choose to use the words "Texas Toast" with the intention of creating confusion between its own products and those of Marzetti.  Roskam argues that "stubborn insistence" on using a mark to which a company believes it is lawfully entitled does not constitute "bad faith."  *Medici Classics Prod. LLC v. Medici Grp.*, LLC, 590 F.Supp. 2d 548, 557 (S.D.N.Y. 2008).

There are factual issues in dispute as to Marzetti's intent in using the words "Texas Toast" on its crouton products. Therefore, this Court can not make a determination at this time as to how this element factors into the likelihood of confusion analysis in this case.

### 8. Likelihood of Expansion of the Product Lines

Where the parties already use the marks in question on identical goods the likelihood of expansion of the product lines is irrelevant. *Victoria's Secret Stores*, 194 F.Supp.2d at 789; *Barrios*, 712 F.Supp. At 619.  Marzetti and Roskam already use the term "Texas Toast" on croutons and are in direct competition. Both Marzetti and Roskam agree that this factor is

irrelevant to the likelihood of confusion analysis.  Therefore, this Court will not consider this factor in determining whether there is a likelihood of confusion.

Material factual issues remain surrounding the determination the factors of: strength of the mark, similarity of the mark, evidence of actual confusion, and intent.  Each of these factors is material in the context of this case.  *Homeowners Group, Inc.*, 931 F.2d at 1107.  Therefore, this court will not grant Summary Judgment based on the likelihood of confusion between the marks.

## D. FAIR USE

Fair use is an affirmative defense that can bar a trademark infringement claim.  A defendant may raise the defense of fair use by establishing that:

> the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin.

15 U.S.C. § 1115(b)(4); *see also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 123 (2004) ("It suffices to realize that our holding that fair use can occur along with some degree of confusion does not foreclose the relevance of the extent of any likely consumer confusion in assessing whether a defendant's use is objectively fair.") Under the fair use doctrine the holder of the trademark "*cannot* prevent others from using the word that forms the trademark in its *primary* or *descriptive* sense."  *Herman Miller, Inc. v. Palazzeti Imports & Exports, Inc.*, 270 F.3d 298, 319 (6th Cir. 2001) (emphasis in original).  The fair use defense allows for "some possibility of consumer confusion." *KP Permanent*, 543 U.S. at 121.

To prevail on a fair use defense a defendant must show it is using the alleged trademark: (1) other than as a mark; (2) in a descriptive sense; and (3) in good faith. *ETW Corp. v. Jireh Publishing, Inc.*, 99 F. Supp. 2d 829, 833 (N.D. Ohio 2000). Each of these prongs is discussed above. As previously stated, there are genuine issues of material fact which prevent the Court from finding that Roskam is using the words Texas Toast: (1) other than as a mark; (2) in a descriptive sense; and (3) in good faith. This Court will not grant summary judgment to Roskam based on Roskam's alleged fair use affirmative defense.

### E. UNCLEAN HANDS

If a plaintiff uses the alleged trademark in a deceptive manner, then the doctrine of "unclean hands" will bar the plaintiff from relief. *California Fig-Syrup Co. v. Frederic Stearns & Co.*, 73 F. 812 (6th Cir. 1896).

> It is well settled that if a person wishes his trade mark property to be protected by a court of equity he must come into court with clean hands, and if it appears that the trade mark for which he seeks protection is itself a misrepresentation to the public, and has acquired a value with the public by fraudulent misrepresentation in advertisements, all relief will be denied to him.

*Id.*

Roskam argues that Marzetti's words are misleading when their crouton package states repeatedly that there is a "Texas Toast cut" of croutons. Marzetti's Texas Toast croutons feature no special "cut" of croutons. The cuts are the same as those found in Marzetti's other croutons; it is the mix of croutons which is different among Marzetti's Texas Toast croutons, which feature more of the largest size and fewer irregular or smaller-sized croutons. Roskam reasons that if Marzetti will not concede "Texas Toast" is a generic term when they are using the words in to describe "big" croutons, then Marzetti has unclean hands because the company is misleading consumers as to what their Texas Toast croutons actually are.

Marzetti argues that the words "Texas Toast" with regard to croutons do not describe anything except the specific cut and size that it selected for its Texas Toast croutons. Marzetti likens its use of Texas Toast to other products like "Coca-Cola flavor" or "Kleenex softness," each of which refer to a brand.

Central to the issue of whether Marzetti has unclean hands such that Roskam should prevail because of the use of this affirmative defense is the meaning of the words "Texas Toast." It is precisely the meaning of "Texas Toast" and any trademark protection to which the words may be entitled that is heavily disputed by the parties. The meaning of "Texas Toast" is a factual determination that is wholly material to this case and about which there are underlying facts in dispute. This Court will not grant summary judgment to Roskam based on Roskam's alleged affirmative defense that Marzetti has unclean hands.

## F. PERMANENT INJUNCTION

A party seeking a permanent injunction must establish each of the following four elements: "(1) actual success on the merits; (2) a substantial threat that it will suffer irreparable injury without the relief requested; (3) that the threatened injury outweighs any damage that the injunction may cause to others; and (4) that the injunction will serve the public interest." *Citizens for Community Values, Inc. v. Upper Arlington Public Library Bd. of Trustees*, No. 2008 WL 3843579, 16 (S.D. Ohio 2008); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12 (1987) (stating that the standard for granting a permanent injunction is "essentially the same," as that for a preliminary injunction, except that a plaintiff must demonstrate actual success on the merits rather than a mere likelihood of success); *see also Chabad of S. Ohio &*

*Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004) (outlining the standard for a preliminary injunction).

In this case, Marzetti's actual success on the merits depends on the analysis under the Lanham Act, including the likelihood of confusion of the marks at issue and the merits of defenses of good faith and unclean hands asserted by Roskam. As discussed above, there are genuine issues of material fact in dispute that prevent the court from granting summary judgment on Marzetti's claims and Roskam's counterclaims. Therefore, the first prong of the test for a permanent injunction has not been met and this Court will not issue a permanent injunction on behalf of Marzetti.

## V. CONCLUSION

For the foregoing reasons Roskam's Motion for Summary Judgment (Doc. 26) and Marzetti's Motion for Partial Summary Judgment (Doc. 37) are **DENIED**.

**IT IS SO ORDERED.**

       __s/Algenon L. Marbley__
       **ALGENON L. MARBLEY**
       **UNITED STATES DISTRICT COURT**

**Dated: March 3, 2010**